IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

------------------------------------------------------ :
                                                       : CASE NO.  1:09 CV 377
STEPHAN S. TOLDY,                                      :
                                                       :
                                    Plaintiff,         : MEMORANDUM OF OPINION AND
                                                       : ORDER DENYING THE DEFENDANTS'
                     -vs-                               : MOTION FOR SUMMARY JUDGMENT
                                                       :
                                                       :
                                                       :
FIFTH THIRD MORTGAGE COMPANY,                          :
et al,                                                 :
                                                       :
                                    Defendant.
------------------------------------------------------

UNITED STATES DISTRICT JUDGE LESLEY WELLS

        This matter comes before the Court on a motion for summary judgment filed by

the defendants, Fifth Third Mortgage Company ("Fifth Third"), and Vista Settlement

Services, LLC ("Vista").  (Doc. 21).  The plaintiff Stephan S. Toldy has filed an

opposition, to which the defendants have replied.  (Docs. 27, 31).  Fifth Third and Vista

have filed a notice of supplementary authority, to which Mr. Toldy has responded.

(Docs. 45, 46).  For the reasons that follow, the Court will deny the defendants' motion.

## I. Background

### A. Introduction

This case involves alleged violations of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.*("RESPA").  Section 8(a) of RESPA prohibits the payment of kickbacks, fees, or any thing of value for the referral of "a real estate settlement service involving a federally related mortgage loan." 12 U.S.C. § 2607(a). While this prohibition sweeps broadly, there is a statutory exemption for affiliated business arrangements under Section 8(c) of the statute, in which a person in a position to refer settlement business either owns part of or is affiliated with a settlement service provider.  To qualify for this exception, an affiliated business arrangement (1) must disclose the relationship to the person whose business is referred, (2) provide the customer with the option of using or not the particular provider of settlement services; and (3) the only thing of value that is received from the arrangement is a return on the ownership interest or franchise relationship.   12 U.S.C. § 2607(c).

Defendant Fifth Third is a mortgage lender and  wholly owned subsidiary of Fifth Third Bank (Ohio), which is itself wholly owned by Fifth Third Financial Corporation ("Fifth Third Financial").[1]  (Doc. 21-2, ¶9 (Hensley Decl.)).  Vista is a provider of settlement services and also a wholly owned subsidiary of Fifth Third Financial. (Hensley Decl. ¶9).  In 2008, the plaintiff Stephan Toldy refinanced a residential mortgage loan with Fifth Third.  (Doc. 21-7, p. 12 (Artwell Depo)).  The settlement work associated with this loan, which included the provision of title insurance and related

_____

[1]Neither Fifth Third Bank (Ohio) nor Fifth Third Financial are parties to this action.

endorsements, was referred by Fifth Third to co-defendant Vista, and Mr. Toldy

ultimately purchased these services through Vista.  (Artwell Depo, pp. 18-20).

The plaintiff later brought this class action lawsuit against Fifth Third and Vista,

alleging that Fifth Third's referral of the title insurance business to Vista was in violation

of RESPA.  (Doc. 1).  In particular, Mr. Toldy alleges that the defendants violated

Section 8(a), because Vista improperly paid a kickback or thing of value pursuant to an

agreement or understanding to refer settlement business.  (Doc. 1, ¶¶28(b), 29, 33, 37).

While the factual grounds for this allegation were unclear at that time, Mr. Toldy's

opposition to the defendants' motion for summary judgment revealed that the alleged

payment of a thing of value took the form of dividend payments to the defendants'

shared corporate parent and non-party Fifth Third Financial.[2]  (Doc. 27, p.22

(hereinafter "Opposition")).

Mr. Toldy further maintains that the defendants do not satisfy the three-part safe

harbor for "affiliated business arrangements" under Section 8(c) of RESPA (Doc. 1,

---

[2]     Since the inception of this case, there has been quite a bit of confusion as to the
factual grounds underlying the allegation that Vista paid a kickback or thing of
value pursuant to an agreement or understanding to refer settlement business.
In his opposition, Mr. Toldy argues that the requisite "thing of value" is satisfied
by Vista's dividend payments to its corporate parent, Fifth Third Financial.
(Opposition, pp. 17).   However, he vacillates between this argument and the
apparent contention that proof of a payment of a thing of value is not even
necessary, because the defendants alleged failure to meet Section 8(c)'s safe
harbor is an independent RESPA violation, irrespective of whether the
defendants violated Section 8(a).  As discussed *infra* Section III.B, the Court will
refrain from addressing the latter argument directly, since Mr. Toldy has raised a
genuine issue of material fact as to whether Vista's dividend payments to Fifth
Third Financial amount to a Section 8(a) violation.

3

¶¶40, 41, 42; Doc. 27, pp. 26-37), and that Vista is a sham settlement services provider. (Doc. 1, ¶¶43-50; Doc. 27, pp. 37-43).  To qualify for the safe harbor, the defendants must meet the disclosure requirements, as outlined under 12 U.S.C. § 2607(c)(4)(A) and 24 C.F.R. § 3500.15.  Mr. Toldy alleges that disclosure was procedurally inadequate because it did not adhere to the form detailed in the federal regulations, requiring the referring party to present the disclosure on a "separate piece of paper" and in accordance with Appendix D of the regulations.  Mr. Toldy also maintains that the defendants have failed to meet the safe harbor requirements that he not be required to use Vista as a condition of his loan, and that the only thing of value received from the defendants affiliated relationship is a return on an ownership interest.

### B. Statement of Facts

Defendant Vista is a provider of various loan settlement services related to mortgage loan transactions, including title insurance examination, title commitment preparation, lien clearance, preparation of HUD statements, among others. (Rheinlander Dec. ¶¶ 3-4).  Vista also acts as a title insurance agent for numerous title insurance underwriters.  (Rheinlander Dec. ¶4).  Pursuant to the terms of its agreements with the various underwriters, Vista is required to collect the title insurance premium owed to the underwriter, and remit that premium, less Vista's commission, to the underwriter.  (Rheinlander Dec. ¶8).  As a wholly owned subsidiary of Fifth Third Financial, the varying amounts of cash that Vista accumulates as a result of its operations are issued as a dividend to its parent, on an approximately annual basis.

4

(Rheinlander Dec. ¶13).  No other entity receives distributions of Vista's profits.

(Rheinlander Dec. ¶13).  While the defendants claim that Vista's payment of profits to

Fifth Third Financial is based solely on the parent's ownership interest in Vista, Mr.

Toldy contends that this remains an issue of fact.  (Rheinlander Dec. ¶13).

Vista receives the majority of its business from certain affiliated companies that

originate mortgage loans, including co-defendant Fifth Third Mortgage, among several

others.  (Rheinlander Decl. ¶15).  It is undisputed that this arrangement qualifies as an

"affiliated business arrangement" as that term is defined by RESPA.[3]  Vista has in the

past provided settlement services to several unaffiliated entities offering mortgage

products.  (Rheinlander Decl. ¶15).  However, business arising from these

arrangements has apparently tapered off in the recent past, and the vast majority of

Vista's services now involves affiliated companies.  (Rheinlander Depo, p. 86-89; 125-

26).

*Mr. Toldy's Loan Transaction*

The specific circumstances surrounding Mr. Toldy's loan refinancing and the

referral of the settlement business to Vista are as follows.  In January 2008, Mr. Toldy

contacted Fifth Third Bank in regards to refinancing his mortgage.  (Artwell Depo, p. 12).

After he provided mortgage loan officer James Artwell with preliminary personal and

---

[3]      The term "affiliated business arrangement" means an arrangement in which (A) a person who is in a position to refer business incident to or a part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider. 12 U.S.C. 2602(7).

5

financial information over the phone, the two men met at Fifth Third's offices, where Mr.
Toldy completed and signed his refinance application.  (Artwell Depo, pp. 12, 27-28,
49).

At that time it was decided that the settlement work associated with the loan
would be referred to Fifth Third's affiliate Vista.  (Artwell Depo, pp. 18-20).  According to
Mr. Artwell, Fifth Third typically selects Vista as the provider of settlement services, so
long as the customer does not object.  (Artwell, p. 18).  He testified that in making the
referral he provided Mr. Toldy with the required disclosures and obtained his signature.
(Artwell Depo, pp. 12-18).  Mr. Artwell did not recall if he specifically discussed using
Vista with Mr. Toldy.  (Artwell, p. 18).

Mr. Artwell provided Mr. Toldy with various documents, two of which are relevant
to the Court's decision. (Artwell Depo, pp. 12-13).  The Acknowledgment Form and Fifth
Third's "Mortgage Loan Disclosure Booklet," referred to as the "GLAD book" are
described as follows.

*The GLAD Book and the ABA Disclosure Form*

The GLAD book is a sixty-eight page booklet containing 19 different forms and
disclosures.  (Doc. 27, p. 15; Doc. 21-10, p. 2).  One of the disclosure forms bound
within the GLAD book is the RESPA required Affiliated Business Arrangement
Disclosure ("ABA Disclosure").  The RESPA safe harbor plainly requires that this
document be presented on a separate sheet of paper, and, as discussed below, it is
clear that it was not in this instance.  Furthermore, the safe harbor requires the
presence of a signature and acknowledgment box on this form, and it is undisputed that

6

it did not include one.  The ABA disclosure form does however explain the following to

the customer:

> This is to give you notice that <u>Fifth Third Mortgage Company</u> has a business relationship with <u>Vista Settlement Services, LLC.</u>  <u>Vista Settlement Services, LLC and Fifth Third Mortgage Company are wholly owned subsidiaries of Fifth Third Bank, an Ohio Corporation.</u>  Because of this relationship, this referral may provide to the referring party a financial benefit.

(Doc. 21-2, p. 8 (hereinafter "ABA Disclosure"))(emphasis in original).  Just below this

disclosure, it is further explained that:

> * * * You are not required to use the listed provider(s) as a condition for settlement of your loan on OR purchase, sale, or refinance of the subject property.  THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH THE SIMILAR SERVICES.  YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

(ABA Disclosure)(emphasis in original).  The form then provides that Vista Settlement

Services, LLC would be the settlement services provider, and it lists the estimated

charge or range of charges for various settlement services, if the customer were to

choose to use its services.  (ABA Disclosure).

> *The Tear-out Acknowledgment Form*

While Mr. Toldy did not have the opportunity to sign the ABA disclosure form

contained in the GLAD book, it is undisputed that he signed the tear-out

Acknowledgment Form, which purportedly acknowledged his receipt and understanding

of the entire contents of the GLAD book, including the ABA Disclosure.  (See Doc. 21-

10, p. 2, (hereinafter "Acknowledgment Form")).  Mr. Artwell removed the

Acknowledgment Form from the GLAD booklet and presented it separately to Mr. Toldy

before he signed it.  (Artwell Depo, pp. 49-50; Toldy Responses ¶¶3,4).  The

Acknowledgment Form states the following: "I/We hereby acknowledge receipt of the [GLAD] Booklet.  I understand that the booklet is provided to explain certain aspects of my mortgage loan.  I/We have read and understand the documents in this booklet. . . . " (Acknowledgment Form).

The Acknowledgment Form is essentially a blanket acknowledgment, in that it is meant to evidence receipt and understanding of all nineteen different disclosures included in the GLAD booklet.  (See Acknowledgment Form).  The form provides one line descriptions of each of the items contained in the GLAD book, and the sixth item on the list is the "Affiliated Business Arrangement Disclosure."  Below the list of disclosures, the Acknowledgment Form features a second acknowledgment, entitled "Servicing Disclosure Statement Acknowledgment of Mortgage Loan Applicant."  It states:  "I/We have read this disclosure form, and understand its contents, as evidenced by my/our signature(s) below.  I/We understand that this acknowledgment is a required part of the mortgage loan application."  The bottom portion of the form bears Mr. Toldy's signature dated 20 January 2008, along with that of Mr. Artwell, the mortgage loan officer in this instance.

Mr. Artwell testified that as a general practice he reviews the sections of the GLAD booklet applicable in any given loan, which would presumably include the ABA disclosure form, but it is not entirely clear whether he did so with Mr. Toldy.  (Artwell Depo, p. 20).  But, whatever the case, it is undisputed that he presented Mr. Toldy with the tear-out Acknowledgement Form pulled from the GLAD booklet, and that Mr. Toldy signed it.

The defendants have motioned the Court for summary judgment, arguing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.  The issues before the Court are, in a nutshell, (1) whether the defendants violated Section 8(a) of RESPA when Vista paid dividends to non-party and corporate parent Fifth Third Financial pursuant to an agreement to refer settlement work, and (2) if there are factual issues precluding summary judgment on that point, whether the defendants have satisfied the safe harbor requirements of Section 8(c) which would relieve them of potential Section 8(a) liability.

## II. Summary Judgment Standard

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

9

**III. The Real Estate Settlement Procedures Act**

Congress enacted RESPA to ensure greater disclosure of real estate settlement fees and to protect consumers from "unnecessarily high settlement charges caused by certain abusive practices." 12 U.S.C. § 2601(a).  Among Congress's goals was "the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(2).  Accordingly, section 8(a) of RESPA states:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a).

RESPA, however, provides a statutory exemption for "affiliated business arrangements."  RESPA defines these arrangements as:

> [A]n arrangement in which (A) a person who is in a position to refer business incident to or a part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider.

12 U.S.C. § 2602(7).  It is undisputed that relationship between Fifth Third, Vista, and Fifth Third Financial amounts to an ABA.

To qualify for this exception, an affiliated business arrangement must meet a four-part test.  First, the affiliated business arrangement must disclose the nature of its relationship with the referring individual to the person being referred. 12 U.S.C. § 2607(c)(4)(A).  Second, the person being referred must not be required to use any

10

particular provider of settlement services. 12 U.S.C. § 2607(c)(4)(B).  Third, the person

referring business to the affiliated business arrangement must receive payments only in

the form of a return on investment.  12 U.S.C. § 2607(c)(4)(C).  Finally, the provider of

settlement services must be a "bona fide provider" of such services.  See HUD

Statement of Policy 1996-2, Regarding Sham Controlled Business Arrangements, 61

Fed.Reg. 29258 (June 7, 1996).

### A. The Alleged Violation of 12 U.S.C. § 2607(a)

Section 8(a) of RESPA states that "no person shall give and no person shall

accept any fee, kickback, or thing of value pursuant to any agreement or understanding,

oral or otherwise, that business incident to or a part of a real estate settlement service

involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. §

2607(a).

Therefore, in order for there to be a violation of 12 U.S.C. § 2607(a), three

elements must be present: 1) a payment or a thing of value; 2) made pursuant to an

agreement to refer settlement business; and 3) an actual referral.  Egerer v. Woodland

Realty, Inc., 556 F.3d 415, 427 (6th Cir. 2009)(citing Culpepper v. Irwin Mortgage Corp.,

491 F.3d 1260, 1265 (11th Cir.2007)).  As there is no question that an actual referral

occurred in the present case, the Court need only address the first two elements.

#### 1. Payment of a Thing of Value

Mr. Toldy maintains that the "fee, kickback, or thing of value" element is satisfied

on account of Vista's undisputed yearly payment of cash dividends to Fifth Third

Financial, the corporate parent of both Vista and Fifth Third Mortgage.[4]  (Doc. 27, p. 25;

Rheinlander Depo).  The definition of "thing of value" includes "any payment, advance,

funds, loan, service, or other consideration."  12 U.S.C. 2602(2).  Furthermore, HUD

regulations specifically mention "stock, dividends, [and] distributions of partnership

profit."  24 C.F.R. § 3500.14(d).  Therefore, Congress and the HUD contemplated the

factual basis for Mr. Toldy's allegation that Vista paid a "thing of value," when it

distributed profits to its parent Fifth Third Financial.

On this element, the defendants present various arguments as to why Vista's

payment of stock dividends to its corporate parent, Fifth Third Financial cannot

constitute a "kickback" under these circumstances.   Whatever merit these arguments

may have is irrelevant, however, since in addition to prohibiting "kickbacks," Section

8(a) prohibits the payment of a "thing of value."  Vista's payment of yearly dividends fits

within the definition of "thing of value."

The Court also rejects the defendants' contention that there is no legal basis for

Mr. Toldy's theory that dividend payments *to the defendants' corporate parent*, instead

of Fifth Third itself, could give rise to a Section 8(a) violation.  The defendants complain

that the concept of a "kickback" makes no sense in the context of two wholly owned

---

[4]     Although the exact nature of Mr. Toldy's Section 8(a) allegation only became
clear with the submission of his response, the parties' briefs squarely present the
issue for the Court's consideration.  (See Opposition, pp. 19-20; Defendants'
Reply, pp. 7-13).  See generally 10A Wright & Miller § 2721, at 43-46 ("The
formal issues framed by the pleadings are not controlling on a motion for
summary judgment; the court must consider the issues presented in other
material offered by the parties...."); see also Johnson v. Mateer, 625 F.2d 240,
242 (9th Cir.1980); Fed.R.Civ.P. 15(b)(2).

subsidiaries of a common parent, as is the case here.  (Doc. 31, p. 13).  They contend

that if Vista's dividend payments to shared parent Fifth Third Financial can be construed

as a kickback to Fifth Third Mortgage, then the payment would likewise constitute a

kickback to Vista.  (Doc. 31, p. 13).  In other words, Mr. Toldy's theory could lead to the

conclusion that Vista pays kickbacks to itself.  (Doc. 31, p. 13).

      Although Mr. Toldy's construction of the statute appears somewhat tautological

from the defendants' point of view, the sweeping language of Section 8(a) demonstrates

Congress' intent to include a scenario involving a referral between wholly owned

subsidiaries of a single parent within RESPA's ambit.  Section 8(a) places no direct

limitations on who might give or accept a fee, kickback, or thing of value, in violation of

the statute.  It broadly states that "no person shall give and no person shall receive any

fee, kickback, or thing of value . . . ."  12 U.S.C. 2607(a).  The term "person" includes

"individuals, corporations, associations, partnerships, and trusts."  12 U.S.C. § 2602(5).

Fifth Third Financial clearly fits in this category.

      Furthermore, relevant definitions under 12 U.S.C. § 2602 support this

construction. The definition of "affiliated business arrangement" describes a relationship

in which an entity in the position to refer settlement business, *or an associate* of that

entity, has a direct ownership interest in the provider of settlement services.  <u>See</u> 12

U.S.C. § 2602(7)(emphasis added).  The term "associate" refers to "a corporation or

business entity that controls, is controlled by, or is under common control" with a person

in a position to refer settlement business.  <u>See</u> 12 U.S.C. § 2602(8).  By defining the

term "affiliated business arrangement" broadly to include an "associate" of the referring

13

entity, Congress contemplated that an arrangement whereby the party to whom referral was made might pay a "thing of value" to the corporate parent of the referor.  See 12 U.S.C. § 2602(2).  Because Fifth Third Financial fits into this scheme, Mr. Toldy's allegations could amount to a Section 8(a) violation.

The defendants also rely on several cases for their contention that Vista's dividend payments to common parent Fifth Third Financial cannot amount to a Section 8(a) RESPA violation.  They cite three RESPA cases in which the ownership structure of the affiliated business entities was similar to that in the present case, and in which presumably, the referee entity, like Vista in the present case, paid dividends to a shared corporate parent.  They argue that in none of those cases did a court find that the referee entity's presumed payment of dividend amount to a Section 8(a) RESPA violation.  For instance, in Krupa v. Landsafe, the defendants Landsafe and Countrywide Home Loans were both wholly-owned subsidiaries of Countrywide Financial.  Krupa v. Landsafe, Inc., 514 F.3d 1153, 1154 (11th Cir. 2008).  Countrywide Home Loans referred "virtually all of its credit reporting business to Landsafe."  Id. at 1156.  The present defendants point out that Landsafe, as a wholly owned subsidiary of Countrywide Financial, *presumably* paid dividends to the shared parent, but the court did not find "a speck of evidence" of a Section 8(a) violation.  Even if the present defendants are correct and the presumed payments were made in Krupa, its holding has no influence on this one, because the Krupa court was not called upon to answer

the question posed to this Court. Quite simply, neither <u>Krupa</u> nor the other cases[5] cited by the defendants addressed whether and under what circumstances dividend payments would amount to a RESPA violation.

In sum, the defendants point to no case law or statutory language that could be read to directly limit the statute's applicability to a payment of a "thing of value" made to the entity that actually made the referral. Moreover, the focus of RESPA with respect to affiliated business arrangements is on promoting advance disclosure of the nature and costs of the settlement process. <u>See</u> discussion *infra*, Sec. III.B.1. The defendants cite no reason or evidence that Congress, in pursuit of this goal, would wish to limit applicability of RESPA in the way the defendants propose. Therefore, the defendants cannot establish that the "thing of value" requirement is unfulfilled as a matter of law.

### 2. Made pursuant to an Agreement

In order to determine whether the payment of a thing of value was made pursuant to an agreement or understanding to refer settlement business, HUD regulations advise the following:

> An agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern or course of conduct. When a thing of value is received repeatedly and is connected in any way with the volume of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business.

---

[5]  <u>See Cornelius v. Fidelity Nat. Title Co.</u>, 2009 WL 596585 (W.D. Wash. March 9, 2009); <u>Jankanish v. First American Title Ins. Co.</u>, 2009 WL 779330 (W.D. Wash. March 23, 2009);   These cases stand for the proposition that a plaintiff must allege a payment of a kickback, referral fee, or a "thing of value" in order to maintain a claim under Section 8 of RESPA. Because Mr. Toldy has done so, these cases are inapposite.

24 C.F.R. § 3500.14(e).  In addition, HUD comments suggest the following considerations in making this determination, where, as here, dividend payments are the alleged "thing of value": how minor the proportion of referral business; the actual circumstances leading to the referral; the relation in time between referral and period of business on which any dividends or other payments were based; whether there are any dividends or other payments; and whether the referring party (if an "associate") knew of the affiliated business arrangement.  <u>See</u> 53 Fed. Reg.  17424-01, 1988 WL 269748 (16 May 1988).  Because HUD is charged with administering and interpreting RESPA, its regulations are instructive in discerning the meaning of the statute's provisions.  <u>Carter v. Welles-Bowen Realty, Inc.</u>, 553 F.3d 979, 988 (6th Cir. 2009).

Mr. Toldy argues that Vista's pattern and practice of paying annual dividends to Fifth Third Financial demonstrates the existence of an agreement or understanding to refer settlement business.  (Doc. 27, p. 27).  First, it is undisputed that Vista distributes profits to its parent on an approximately yearly basis.  (Rheinlander Decl. ¶13).  Mr. Toldy also points to the deposition testimony of Keith Rheinlander, who stated that "Vista's primary purpose is to provide a mechanism by which Fifth Third can enjoy an additional source of revenue for mortgage loan that are generated by Fifth Third Bank." (Rheinlander Depo, p. 93).  Mr. Rheinlander further indicated that "Fifth Third's return on its investment in Vista . . . is dependent upon revenue generated from title policies issued in connection with Fifth Third loans."  (Rheinlander Depo, pp. 93-94).  Mr. Toldy maintains, and the Court agrees, that this is sufficient to raise a genuine issue of

material fact as to the existence of an agreement or understanding to refer settlement business.

Vista's yearly dividend payments are repeated.  They are also *in some way* connected with the volume of business Fifth Third Mortgage refers, as evidenced by Mr. Rheinlander's testimony.  See 24 C.F.R. § 3500.14(e)(the Court should consider whether "a thing of value is received repeatedly and is connected *in any way* with the volume of the business referred").  This conclusion is further supported by evidence that Vista has, at least in the recent past, done little settlement work for lenders other than Fifth Third, and receives much, if not all, of its revenue through the referrals of affiliates. (Rheinlander Depo, pp. 86-90; 125-26).  Therefore, because the vast majority, or possibly all, of Vista's settlement business comes from affiliate referrals, and Vista's primary source of revenue stems from those referrals, Vista's profits, which ultimately take the form of dividend payments to Fifth Third Financial, are not only in some way connected, but closely proportional to the volume of business referred.  As such, Vista's yearly dividend payments to Fifth Third Financial are evidence of an agreement or understanding to refer settlement business.

In addition, the factors recommended by the HUD also lean toward denying summary judgment on this point.  First, the proportion of business referred by Fifth Third is in no way minor: the testimony of Mr. Artwell suggests that Vista handles the vast majority of Fifth Third's settlement work.  Furthermore, there is evidence on the record showing that the full extent of Vista's business is obtained from affiliated entities, including Fifth Third.  Second, the actual circumstances leading to the referral indicate

17

that Vista handles Fifth Third's settlement work as matter of routine.  Mr. Artwell testified that Fifth Third always uses Vista unless a particular customer objects.   Third, Fifth Third, the referring entity, clearly knew of the affiliated business relationship.  These factors, when considered in their totality, weigh against summary judgment on this point.

The defendants seem to concede that the above analysis under Section 3500.14(e) could yield such a result, but they urge the Court to consider other HUD guidance on this issue, which they contend dictates a different outcome.  (Doc. 31. p. 11).  The HUD comments cited to by the defendants address the sort of dividend or distribution schemes proscribed under RESPA.  See 53 Fed. Reg. 17425 (16 May 1988).  Specifically, they provide an example of an "illegal dividend" scheme, whereby "the dividends, amount of stock or share of partnership profits varied in proportion to actual or anticipated referrals by the owner/partner."  Id.  The defendants suggest this language mandates that the proper inquiry for the Court is not simply whether there is a connection between payment and referral of business, but whether the *percentage* return varies in proportion to the amount of business referred.  Under this rubric, the defendants maintain that because Vista invariably pays 100% of its dividends to Fifth Third Financial, any allegation of an agreement or understanding to refer settlement business must fail as a matter of law.

This argument is without merit for several reasons.   First, the comments notably indicate that the "HUD currently has no regulatory position concerning the legality of [affiliated business arrangements], except to the extent that Regulation X indicates that payment of dividends . . . may constitute the transfer of a 'thing of value.'"  See 53 Fed.

18

Reg. at 17,425, 1988 WL 269748 (16 May 1988).  As such, it is clear that the language cited to by the defendants is only meant to be illustrative.  And any interpretation otherwise is further contradicted by comments indicating that the HUD has no stated position on "the legality of [affiliated business arrangements] where payments are less obviously part of referral agreements or understandings."  Id.  Therefore, the HUD comments do not limit this inquiry as the defendants suggest.

Further, the Court substantively rejects the defendants' interpretation, since it would overly restrict the analysis of dividends paid by wholly owned subsidiaries in a manner not envisioned by Congress.  Presumably, a wholly owned subsidiary *always* pays 100% of its profits to its parent.  Thus, under the defendants' rule, any allegation that a wholly owned subsidiary paid dividends to its parent in violation of RESPA would always fall short.  By outlining rules for ABAs, which are applicable to business arrangements in which one entity has a greater than 1% ownership interest in the other, and by including "any payment" in the definition of "thing of value," Congress intended that in certain cases a wholly-owned subsidiary's payment of dividends to its parent could amount to a RESPA violation.  The defendants' interpretation on the HUD comments would provide affiliated business arrangements involving a wholly owned subsidiary an apparent *per se* immunity from allegations of an improper payment of dividends.

On the flip side, however, the Court addresses the risk, as the defendants perceive it, that a broader reading of this element could result in the inference of an "agreement or understanding" in almost every case involving the payment of dividends.

That is, because a yearly payment of dividends would always have *some* connection to the volume of business referred, this broader standard could give rise to the presumption that an ABA is acting pursuant to an agreement or understanding to refer settlement business.  While the HUD has been somewhat ambivalent as to whether an ABA should be a presumed Section 8(a) violator, having gestured toward such a reading at one point, it explicitly withdrew the suggestion in the final rule, stating that the concept of a presumption . . . has been deleted from the rule."  See 53 Fed. Reg. 17424 (18 May 1988)("the existence of [an affiliated business arrangement] probably must raise the presumption of a Section 8 violation"); Cf. 57 Fed Reg. 49600 (2 Nov. 1992).

In accordance with the HUD comments, therefore, the Court does not simply presume that the instant ABA has violated Section 8(a).  Rather, the analysis here is circumscribed by a consideration of the HUD recommended factors discussed above, including the volume of business referred, the circumstances of referral, and the knowledge of the referring entity.  And, in light of these factors, the Court is not prepared to rule as a matter of law that the facts as presented fail to amount to an "agreement or understanding to refer settlement business."

Further, given Congress's inclusion of the Section 8(c)(4) safe harbor for affiliated business arrangements, the Court's broader reading of Section 8(a) comports with the internal logic of the statute.  See Pettrey v. Enterprise Title Agency, Inc., 241 F.R.D. 268, 275 (N.D. Ohio 2006)("The safe harbor of Section 8(c)(4), which provides for ABAs, is necessary precisely because ABAs are by their nature likely to fall under the sweeping language of Sections 8(a) and 8(b)").  This statute is constructed in such a

20

way that the Court must first consider whether the elements of Section 8(a) have been satisfied.  Once it has done so, it must then consider whether the defendants are relieved of liability under the Section 8(c)(4) safe harbor.  A necessary condition of the safe harbor is whether the "only thing of value that is received from the arrangement . . . is a return on the ownership interest."  12 U.S.C. § 2607(c)(4)(C).  This condition is an express limitation on the types of dividend payment arrangements which are broadly captured by the definition of "thing of value" under Section 8(a).

In essence, the defendants seek to import this portion of the safe harbor analysis into the threshold considerations made under Section 8(a).  The defendants' argument, at its heart, is that because Vista always pays 100% of its dividends to its parent, Fifth Third receives no more than it is rightfully entitled to as sole shareholder.  As such, the defendants maintain that no untoward dividend scheme can be inferred from this arrangement.  In so far as this may be true, this consideration cannot enter the front end analysis, when the statute explicitly appropriates it to the back end inquiry as to whether "the only thing of value that is received from the arrangement . . . is a return on the ownership interest."  See 12 U.S.C. § 2607(c)(4)(C).

It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute.   Lyons v. Ohio Adult Parole Authority, 105 F.3d 1063 (6th Cir. 1997).  A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant. If the Court were to limit its Section 8(a) analysis as the defendants suggest, and find no violation as a matter of law based on Vista's 100% return rate, it would render

21

superfluous Congress' inclusion of the third safe harbor requirement under Section 8(c).

Further, under the defendants' construction, the Court could never even reach an

analysis under Section 8(c) in this instance, unless it were first shown that dividend

payments were comprised of something more than Fifth Third Financial's ownership

interest in Vista.  If this showing were required--and made--under Section 8(a), then the

third safe harbor requirement would be entirely redundant.  While the dividend

payments that Vista made to its parent may have been above board for purposes of

RESPA, the Court will not sacrifice the logic of the statute to reach that conclusion, by

directly importing a Section 8(c) analysis into its consideration of the elements of

Section 8(a).

   In addition, review of the legislative history of RESPA reveals that the Court's

reading of Section 8(a) is consistent with the intent of Congress to "provide reasonable

consumer safeguards when persons in a position to refer settlement business make

such referrals to entities with which they or their associates have an ownership interest."

See H.R. Rep. No. 97-532, 97th Cong., 2nd Sess. at 54.  The potential problem that

Congress saw with affiliated business arrangements was that "the advice of the person

making the referral may lose its impartiality and may not be based on his professional

evaluation of the quality of service provided if the referror or his associates have a

financial interest in the company being recommended."  Id.

   In sum, on the question of the defendants' potential liability under Section 8(a)

the Court has been presented with sufficient evidence from which a jury could

reasonably find for Mr. Toldy, the non-moving party. As such, summary judgment is inappropriate on this issue.

### B. RESPA's Section 8(c)(4) Safe Harbor

As an initial matter, the Court notes that the parties dedicate a significant amount of briefing to the apparently thorny question of whether an ABA's failure to satisfy RESPA's safe harbor requirements in Section 8(c)(4) amounts to a *per se* RESPA violation, irrespective of an allegation of liability under Section 8(a). Needless to say, the analysis *supra* outlines the Court's position on this question, at least in an indirect way, making further discussion unnecessary.[6] Furthermore, since Mr. Toldy has raised an issue of fact as to whether the defendants are in violation of Section 8(a), the question is moot.

While the question of the defendants' Section 8(a) liability may still be a matter of debate, if they can show that no genuine factual issues exist related to the safe harbor

---

[6]      It should be noted, however, that McCullough v. Howard Hanna Co., 2010 WL 1258112, 09 CV 2858 (N.D. Ohio, March 26, 2010), which the defendants brought to the Court's attention on a notice of submission of supplementary authority (Doc. 45), is distinguishable from the present case.

The holding in McCullough, like that in Cornelius and Jankanish (see note 5), stands for the proposition that a plaintiff cannot sustain a cause of action under Section 8 of RESPA without having alleged a payment of a kickback, referral fee, or thing of value. Further, McCullough makes clear that a defendant ABA's failure to meet the safe harbor requirements of Section 8(c)(4), in the absence of a well pled cause of action under Section 8(a), does not amount to its own independent RESPA violation. See McCullough, 2010 WL 1258112, at *5.

Unlike McCullough, the present case contains allegations of a payment of "any thing of value" in the form of dividend payments. The question before this Court, as the parties have presented it, is whether Vista's payment of dividends to Fifth Third Financial pursuant to an agreement to refer settlement business, amounts to a potential Section 8(a) violation, and this question was answered in the affirmative. Therefore, McCullough is inapposite.

23

requirements of Section 8(c)(4), they could be relieved of any potential liability at this stage of the proceedings.  Section 8(c)(4) states, in pertinent part:

> Nothing in this section shall be construed as prohibiting . . . (4) affiliated business arrangements so long as (A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred . . .  (B) such person is not required to use any particular provider of settlement services, and (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship . . . .

Therefore, an affiliated business entity is not liable under Section 8(a), where (1) it properly discloses "the existence of [the affiliated business] arrangement" and provides a "written estimate of the charge or range of charges imposed" by the affiliated business entity; (2) the person being referred is not required to use any particular service as a condition precedent to the availability of another service; and (3) no payments other than a return on ownership interest or payments otherwise permitted under RESPA may be received under the affiliated business arrangement. Spicer v. Ryland Group, Inc., 523 F.Supp. 2d 1356, 1360 (N.D. Ga. 2007), aff'd, 294 Fed. Appx. 434 (11th Cir. 2008).

*1. Disclosure of the Existence of the Affiliated Business Arrangement*

Whether the defendants qualify for the Section 8(c) safe harbor depends first upon proper disclosure of "the existence of [the affiliated business] arrangement" and the provision of "written estimate of the charge or range of charges imposed" by the affiliated business entity."  12 U.S.C. § 2601(b)(2).  As already noted, Mr. Toldy does not contend that the defendants substantively withheld any of this information, and it is undisputed that the Fifth Third provided him with an ABA Disclosure Form containing it.

24

(Hensley Decl. ¶¶4-7; Doc. 21-2, p. 8; Doc. 21-8, ¶1).  He nonetheless maintains that the form that the disclosures took was so inadequate that he was denied effective and meaningful disclosure.  (Opposition, pp. 21-25).  As a consequence, Mr. Toldy argues that the defendants have failed to satisfy a necessary condition of the Section 8(c) safe harbor.

Mr. Toldy argues in particular that Fifth Third failed to follow the technical procedures set out in the Rules implemented by the HUD.  First, he points out that 24 C.F.R. § 3500.15(b)(1) explicitly requires that "disclosure must be provided on a separate piece of paper no later than the time of each referral."  (Opposition, pp. 21-22). He maintains, correctly, that the defendants failed to comply with this requirement when they presented the ABA Disclosure Statement within the bound GLAD booklet among numerous other disclosures.  (Opposition, pp. 21-22).  Secondly, he notes that Section 3500.15(b)(1) requires that the referring party use the format set out in Appendix D of the regulations.  (Opposition, p. 21).  Mr. Toldy contends, also correctly, that the ABA Disclosure Statement provided by Fifth Third does not accord with this format, because it does not include the requisite acknowledgment and signature line that would evidence his receipt and understanding of the disclosures.  (Opposition, pp. 22-23).

Because the regulations are clear and the defendants have offered no valid arguments otherwise,[7] little discussion is required on this point.  The regulations plainly

---

[7]    The defendants attempt to argue that the "separate piece of paper" requirement is satisfied because the ABA Disclosure Statement was printed on a "separate page" of a bound booklet, but the plain meaning of the phrase "separate piece of paper" must prevail here.  Where the language of a statute, or, in this case, an administrative regulation, is clear and unambiguous, the Court must give the words their usual and ordinary meaning.  Connecticut Nat'l Bank v. Germain, 503

require the presentation of disclosures on "a separate piece of paper."  <u>See</u> 24 C.F.R. §

3500.15(b)(1).  And it is undisputed that the ABA Disclosure Statement was bound

within the GLAD booklet and not presented on a separate piece of paper.  Furthermore,

the format set out in Appendix D format plainly requires an acknowledgment and a

signature line.  <u>See</u> 24 C.F.R. § 3500.15(b)(1); 61 F.R. 58472-01, 1996 WL 660265,

Appendix D.  It is undisputed that the ABA Disclosure Form included in the GLAD

booklet does not include one.  Therefore, the deviations from § 3500.15(b)(1) constitute

technical noncompliance with the regulations.

However, the defendants maintain that despite these technical deviations they

have complied with Section 8(c)(4) because they adequately fulfilled the purpose of the

disclosure requirements.  Indeed, strict technical compliance with 24 C.F.R. §

3500.15(b)(1) and Appendix D is not required, and the Sixth Circuit has recognized a

certain latitude with respect to the form that disclosure must take under RESPA.  <u>See</u>

<u>Vega v. First Fed. Sav. & Loan Ass'n</u>, 622 F.2d 918, 925 (6th Cir. 1980).  In <u>Vega</u>, the

court addressed the standard of compliance as to uniform settlement statements and

announced that RESPA does not create "such a rigid and inflexible standard so as to

impose civil liability for deviations from the uniform settlement statement which could not

---

U.S. 249, 253 (1992)(noting that the Court has "stated time and again that courts
must presume that a legislature says in a statute what it means and means in a
statute what it says there"); <u>Rucker v. Wabash R. R. Co.</u>, 418 F.2d 146, 149-50
(7th Cir. 1969)(Same rules of construction apply to construction of administrative
regulations as apply to construction of statutes).  There is nothing ambiguous
about this language, and it is therefore presumed that HUD's "separate piece of
paper" requirement means exactly what it says.  Therefore, by binding the ABA
Disclosure Form among numerous other documents in the GLAD booklet, the
defendants are technically out of compliance with the "separate piece of paper"
requirement.

possibly impair the effectiveness of such statements." <u>Vega v. First Fed. Sav. & Loan</u>
<u>Ass'n</u>, 622 F.2d 918, 925 (6th Cir. 1980).

Specifically, in that case the court addressed whether minor deviations from the
format prescribed by the regulations amounted to a RESPA violation. <u>Id.</u> at 924-25.
The settlement statement at issue utilized the precise terms prescribed by the
regulations, but it capitalized certain items that were not capitalized in the uniform
settlement statement and failed to capitalize other items. <u>Id.</u> Despite an agency
mandate that no changes in the size of type were to be made, the court concluded that
because these deviations "did not obfuscate any of the information contained in the
settlement statement," they did not result in a violation. <u>Id.</u> at 925. However, <u>Vega</u> also
made clear that in some cases technical changes in the settlement statement could
represent a threat to its basic purpose. <u>Id.</u> And, presumably, this second sort of
technical change would result in a violation.

While <u>Vega</u> provides a starting point for addressing whether the failure to provide
the ABA Disclosure Statement on a separate piece of paper and the absence of an
acknowledgment box amounts to inadequate disclosure, it does not answer the
question conclusively, as the defendants suggest. In order to determine whether the
deviations in the present case impaired the effectiveness of disclosure or somehow
obfuscated the information contained in the disclosure, the Court will consider, as <u>Vega</u>
suggests, whether the changes "represent a threat to the basic purpose" of the ABA

Disclosure Statement.  Id. at 925.  To do so, the Court begins by addressing the purpose of RESPA generally and that of the ABA Disclosure Statement.

One of the stated purposes of RESPA is "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process."  See 12 U.S.C. § 2601(a).  Congress recognized the importance of this goal in the context of affiliated business arrangements because of the potential that "a consumer who is referred by a real estate professional to a controlled title insurance company is likely to pay unreasonably high premiums, to accept poor service or to receive faulty title examinations."  H.R. Rep. No. 97-532, 97th Cong., 2nd Sess. at p. 51.  Furthermore, as discussed supra, Congress expressed additional concerns:

> Real estate professionals, such as real estate brokers or lenders, are in a unique position to influence or control a consumer's decision regarding the selection of various settlement service providers, such as hazard insurance agents, title insurance agents, mortgage insurers of escrow agents. [Affiliated] business arrangements cause concern because the advice of the person making the referral may lose its impartiality and may not be based on his professional evaluation of the quality of service provided if the referror or his associates have a financial interest in the company being recommended.  In addition, since the real estate industry is structured so that settlement service providers do not compete for a consumer's business directly, but almost exclusively rely on referrals from real estate brokers, lenders or their associates for their business, the growth of [affiliated] business arrangements effectively reduce the kind of healthy competition generated by independent settlement service providers.

H.R. Rep. No. 97-532, 97th Cong., 2nd Sess. at 52.  With these considerations in mind, Congress saw fit to provide reasonable consumer safeguards in the form of the disclosure requirements of Section 8(c), so that a customer dealing with a lender in an affiliated business arrangement with a settlement services provider might make a relatively educated and informed decision about the options available to her.  See H.R.

28

Rep. No. 97-532, 97th Cong., 2nd Sess. at p. 54.  Those safeguards include the requirements that the lender disclose the nature of its relationship with the referee entity and give the customer the choice of using its services or not.  See 12 U.S.C. § 2607(a).

The Department of Housing and Urban Development, in an effort to implement these safeguards, retained the requirement of the borrower acknowledgment box on the ABA disclosure statement, over the objections of several State Attorneys General.  See 61 F.R. 29238-01, 1996 WL 302878 at *29251.  The HUD specifically recognized the importance of the acknowledgment box, because it not only "focus[es] the attention of the applicant on the document, [but also] protects the lender from charges that it had failed to inform the prospective borrower of the [affiliated] business arrangement."  Id. In this Court's view, this focus of attention is also what the HUD had in mind when it implemented the "separate piece of paper" requirement of Section 3500.15(b)(1).  By requiring that the referring entity present the requisite disclosures *and* a signed acknowledgment *together on a separate sheet of paper*, the HUD meant to draw the consumer's undivided attention to this document and its contents.  With her attention so drawn, the consumer is given the discrete opportunity to review the disclosures, contemplate their meaning, and acknowledge her understanding thereof.

Given RESPA's purpose, the HUD's specific comments on the importance of the signature box, the language of 24 C.F.R. § 3500.15, and the prescribed format of Appendix D, the Court concludes that the presence of the acknowledgment box and the separate piece of paper requirement go to the very purpose of the ABA Disclosure Statement.  Therefore, the deviations are sufficient evidence by which a jury could find

that the effectiveness of disclosure was impaired.   Summary judgment is therefore inappropriate on this issue.

Finally, it is notable that the importance that the HUD placed on these features of the ABA Acknowledgment Form was not present in <u>Vega</u>, upon which the defendants rely heavily.  In <u>Vega</u>, the court found that the settlement statement used the exact terms prescribed by the regulation and that the form was approved by the secretary. <u>Vega</u>, 622 F.2d at 925.  The only difference between the defendant's form and the uniform settlement statement were minor changes in capitalization.  <u>Id.</u> at 924.  While the regulations explicitly stated that "no changes in the size or type style of print . . . shall be made," there was no indication from Congress or the HUD that a failure to follow these instructions would somehow threaten the purpose of the settlement statement.  <u>Id.</u> at 924-25.  This is not the case here, however, since the overall purpose of RESPA, the comments of the HUD, and the importance of the customer's focus on the disclosure form all point to the conclusion that the presence of the signature box on a "separate piece of paper" is central to the ABA disclosure form's purpose.

### 2. Required Use / Payment Other than Ownership Interest / Sham Entity

In order to qualify for the Section 8(c) safe harbor, the defendants must satisfy all of its elements.  Because genuine issues of material fact exist as to the first element, which preclude summary judgment, the Court will not address the remaining elements of Section 8(c) or whether Vista is a sham entity.

30

**IV. Conclusion**

Because there remain genuine issues of material fact on the question of the defendants' Section 8(a) liability, summary judgment is not appropriate.  The defendants' motion is therefore denied.


IT IS SO ORDERED.

      /s/ Lesley Wells
UNITED STATES DISTRICT JUDGE

Date: 29 June 2010

31